## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| INGRID NUSS, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE |
| | ) | NO.: 1:20-cv-9189 |
| v. | ) | |
| | ) | |
| THE GUARDIAN LIFE | ) | |
| INSURANCE COMPANY OF | ) | |
| AMERICA, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW Plaintiff, Ingrid Nuss ("Ms. Nuss"), and files this Complaint against Defendant The Guardian Life Insurance Company of America ("Guardian"), showing the Court as follows:

## HISTORY, JURISDICTION AND PARTIES

1.

This is an action under the Employee Retirement Income Security Act of 1974 as amended ("ERISA"), 29 U.S.C. § 1001 et seq., to recover Long Term Disability ("LTD") benefits under the terms of an employee welfare benefit plan (hereafter "the LTD Plan" or "the Plan") maintained by Drew Eckl & Farnham, LLP ("Drew Eckl"), and to clarify and/or enforce Plaintiff's rights under the Plan.

2.

The LTD Plan is an "Employee Welfare Benefit Plan" as defined by ERISA, 29 U.S.C. § 1002(1).

3.

Jurisdiction is based on ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

4.

Venue is proper in the United States District Court for the Southern District of New York

pursuant to 29 U.S.C. § 1132(e)(2).

5.

Guardian is a New York corporation headquartered in this District.

6.

This Court has personal jurisdiction over Defendant Guardian.

7.

Plaintiff is a "participant" in the LTD Plan, as defined by ERISA, 29 U.S.C. § 1002(7).

8.

The LTD Plan is insured by group policy of insurance G-00291816-HC issued by

Defendant Guardian.

9.

Guardian has made all decisions concerning Plaintiff's claim for benefits and has handled

all communications concerning Plaintiff's claim.

10.

All benefits under the LTD Plan are paid from the general assets of Defendant Guardian.

## RELEVANT POLICY PROVISIONS

11.

The allegations of paragraphs 1 through 10 are hereby realleged as if set forth herein

verbatim.

12.

A copy of the LTD Plan is attached hereto as Exhibit A and is incorporated herein by reference.

13.

Under the LTD Plan, Guardian promised to pay "Disability Benefits", as follows:

> **How Payments Start**: *To start getting payments from this plan, a covered person must meet all of the conditions listed below.*
> *(a) he or she must: (i) become disabled while insured by this plan; and (ii) remain disabled for this plan's elimination period.*
> *(b) he or she must provide proof of loss, as described in this plan's Claim Provisions section.*

(Exh. A, pg. 96).

14.

The Policy further states:

> *Disability or Disabled: These terms mean that a current sickness or injury causes physical or mental impairment to such a degree that the covered person is: (a) not able to perform, on a full-time basis, the major duties of his or her own occupation; and (b) not able to earn more than this plan's maximum allowed disability earnings.*

> *The covered person may be required, on average, to work more than 40 hours per week. In this case, he or she is not disabled if he or she is able to work for 40 hours per week. This limitation does not apply during the first 12 months a covered person works while disabled.*

> *Neither: (a) loss of a professional or occupational license; or (b) receipt of or entitlement to Social Security disability benefits; in and of themselves constitute disability under this plan.*

(Exh. A, pg. 114).

15.

The Policy further states:

***Maximum Allowable Disability Earnings****: This plan limits the amount of income a covered person may earn, or may be able to earn, and still be considered disabled.*

*If the covered person's disability earnings are more than 80% of his or her indexed insured earnings, payments from this plan will end. Payments from this plan will also end if he or she is able to earn more than 80% of his or her indexed insured earnings.*

(Exh. A, pg. 101).

## HISTORY OF CLAIM

### 16.

The allegations of paragraphs 1 through 15 are hereby realleged as if set forth herein verbatim.

### 17.

This is a dispute over Guardian's termination of Plaintiff's LTD benefits after having paid benefits for over 4 years and in the absence of any meaningful evidence of improvement in Ms. Nuss's condition.

### 18.

Ms. Nuss graduated from the Emory University School of Law in 2001.

### 19.

After working for other law firms, Ms. Nuss was hired by Drew Eckl in 2003 and began working as a workers' compensation defense attorney.

### 20.

Ms. Nuss was a prolific trial attorney for Drew Eckl, responsible for handling the majority of the firm's workers' compensation cases that went to trial. She maintained an outstanding trial

record.

21.

By all accounts, Ms. Nuss was hard-working and energetic, working long hours while also participating in numerous personal activities and remaining physically active and fit.

22.

In May 2013, however, Ms. Nuss took ill.

23.

Upon returning to the office from lunch with her staff on May 15, 2013, Ms. Nuss began spontaneously vomiting.

24.

Ms. Nuss initially believed her symptoms to be the result of acute illness, but unfortunately her symptoms did not resolve with time.

25.

Despite continuing symptoms of nausea, vomiting, abdominal pain and often crippling fatigue, Ms. Nuss struggled to continue working as a workers' compensation defense attorney for as long as she was able. However, Ms. Nuss's symptoms were taking a heavy toll on her work.

26.

For the next several months, Ms. Nuss was constantly, severely nauseated, vomited regularly, and experienced severe abdominal pain on a daily basis.  These symptoms left her fatigued to the point of needing to nap during working hours or to having to leave work unpredictably to go home and rest.

27.

Ms. Nuss's symptoms caused fogginess and mental fatigue that interfered with her ability to perform as a defense attorney.

28.

Ms. Nuss's productivity and the quality of her work suffered significantly.

29.

Due to her reduced productivity, Ms. Nuss was forced to work longer hours, including working at home every evening and on weekends, in an attempt to keep up with the demands of her job. Despite her increased efforts, Ms. Nuss was unable to maintain her prior level of production and the quality of her work fell below acceptable levels.

30.

In 2013, Ms. Nuss came under the care of internist Valerie Wender, M.D.

31.

After a series of tests, including an abnormal gastric emptying study, Dr. Wender diagnosed Ms. Nuss with gastroparesis in September 2013.

32.

In January 2014, Ms. Nuss sought care by gastroenterologist Patrick Waring, M.D., who is known as a preeminent motility specialist in the Atlanta GI community. Dr. Waring became, and remains, Ms. Nuss's primary treating physician for her disabling condition.

33.

In or around July 2014, Drew Eckl recommended that Ms. Nuss take a leave of absence to attempt to recover her health, and because her productivity and the quality of her work product

were suffering noticeably due to her illness.

34.

During her time off, Ms. Nuss saw a slight improvement in her symptoms, but not to the point of allowing her to return to work at full capacity or, for that matter, anywhere near an acceptable level of productivity.

35.

Despite still being quite ill, Ms. Nuss had a strong desire to return to work in some capacity. She convinced her boss and the firm to allow her to return to work for Drew Eckl in a part-time capacity on September 2, 2014.

36.

Drew Eckl was highly flexible and allowed her to work in a capacity that would not be hampered by her symptoms. Initially, she was primarily training young associate attorneys and assisting on cases, performing discreet tasks only occasionally.

37.

The part-time position allowed Ms. Nuss to work mainly by telecommuting from home where she could rest as needed and always be near a bathroom. Ms. Nuss was also allowed to manage her own schedule as to when she would go into the office to train attorneys.

38.

Ms. Nuss filed a long-term disability claim with Guardian in September 2014.

39.

Even the highly accommodated, part-time position, proved to be too taxing, the attempt

lasting less than six months. Ms. Nuss went out of work again in or around February 2015.

40.

By letter dated February 13, 2015, Guardian approved Ms. Nuss's claim for disability benefits.

41.

To feel useful and engaged, Ms. Nuss enrolled in Guardian's "rehabilitation program" in May 2015 and began taking on work as a part-time mediator.

42.

In early 2016, Ms. Nuss again returned to work for Drew Eckl in a part-time capacity. She continued to work part-time as a mediator as well.

43.

Over time, Drew Eckl began asking Ms. Nuss to take on more demanding work, including covering for other attorneys' depositions or in-person meetings.

44.

Unfortunately, Ms. Nuss's symptoms often interfered with her ability to handle these additional responsibilities, resulting in last-minute cancellations and interruptions to Drew Eckl's business.

45.

Ms. Nuss also reports, and her employer has confirmed, that the quality of her work was not meeting expectations.

46.

The partner for whom Ms. Nuss worked, Mr. John Bruffey, ultimately decided that he

could not continue to allow Ms. Nuss to work for him due to frequent interruptions to his business and the reduced quality of Ms. Nuss's work – all caused by her GI symptoms of nausea, abdominal pain, vomiting, fatigue and impaired concentration.

47.

In January 2018, Ms. Nuss again ceased working for Drew Eckl.

48.

Ms. Nuss continued attempting sporadic mediation work for several months, but ultimately ceased that as well in mid-2018.

### **Guardian's Termination of Ms. Nuss's Long-Term Disability Benefits**

49.

In spring 2019, Guardian undertook a periodic review of Ms. Nuss's disability claim.

50.

Guardian asked Dr. Waring to complete a Gastrointestinal (GI) Condition Assessment form.

51.

In the Gastrointestinal Condition Assessment Form, Dr. Waring stated that Ms. Nuss suffers from "gastroparesis, chronic nausea, she has abdominal pain, vomiting" and that Ms. Nuss "failed all medical & surgical treatments." (Emphasis in original).

52.

Dr. Waring also stated in the form that Ms. Nuss's condition is not expected to improve.

53.

Nevertheless, by letter dated October 28, 2019, Guardian unilaterally terminated Ms.

Nuss's long-term disability benefits.

54.

Guardian's termination letter cited, as the basis of its decision, a December 2018 office visit note from Dr. Waring which stated that Ms. Nuss was "feeling pretty good."

55.

Guardian stated in its letter that the 2018 office visit note "does not support the ongoing limitations provided in the Gastrointestinal Condition Assessment Form" completed by Dr. Waring on April 18, 2019.

56.

The termination letter also stated that Ms. Nuss had not attended any other office visits between the December 2018 visit with Dr. Waring and the October 2019 termination letter.

57.

Meanwhile, at an office visit with Dr. Waring on October 21, 2019, just eight days before Guardian's termination letter, Dr. Waring documented that he continued to adjust Ms. Nuss's medications, that she only received temporary and partial relief of her disabling symptoms from medications and other treatments, and specifically noted, "Her nausea is unchanged. It occurs every day. She throws up every 2 or 3 days."  This is the office note closest in time to Guardian's decision to terminate benefits.

58.

The termination letter also noted that under the Plan, Ms. Nuss is required to provide "Objective medical evidence in support of the covered person's limitations and restrictions." Ms. Nuss has asked Guardian what type(s) of evidence would be sufficient given the nature of her

disabling GI condition. Guardian failed or refused to provide any clarification whatsoever.

**Ms. Nuss's Administrative Appeal of Guardian's Termination of Benefits**

59.

Via letter on November 20, 2019, Ms. Nuss appealed Guardian's decision to terminate her long-term disability benefits.

60.

In her appeal letter, Ms. Nuss specified the frequency and severity of her disabling symptoms: constant nausea, regular vomiting, copious amounts of gas and bowel issues, frequent abdominal pain and incapacitating fatigue on a daily basis. She described how her anti-nausea medications make her feel dull, and how the nausea distracts her from being able to concentrate or be productive. She described how she has unpredictable good and bad days that make her an "unreliable" worker.

61.

Ms. Nuss's appeal letter explained that Dr. Waring's December 2018 note mentioning "doing well" was unquestionably a remark that should be considered in the context of her overall disabling medical condition and does not constitute a release to return to work full-time as an attorney.

62.

Ms. Nuss's appeal letter also indicated that the reason she did not treat with Dr. Waring between December 2018 and October 2019 was because Dr. Waring had referred her to a colo-rectal surgeon, Dr. Monica Hum, to assess a potential gastrointestinal bleed.

63.

Attached to Ms. Nuss's appeal letter was a statement from Dr. Waring regarding the termination of Ms. Nuss's benefits and providing the context for his December 2018 office visit note.

64.

Dr. Waring stated:

"It has come to my attention that a sentence on my telephone conference from last December has changed the thoughts about whether or not Ingrid Nuss (DOB 05/25/1975) is able to be gainfully employed as an attorney . . . It is not difficult to look at the previous office visits and see that she has had a remarkable number of medical issues, none of which have ever fully responded to medical or surgical therapy. It is unrealistic to think that means that she was doing perfectly well. It meant that her daily abdominal pain was tolerable. Her daily inability to eat food was tolerable. Her daily nausea was tolerable. She has an amazingly good outlook for someone who is this chronically ill. Unfortunately, there is no reason to think that there will be new treatments that would change her overall situation. Thank you for your kind consideration in reevaluating her long-standing disability."

65.

Ms. Nuss's appeal letter also explained that her persistent nausea interferes with her ability to concentrate and perform work tasks. This effect is exacerbated by Ms. Nuss's medications, some of which cause drowsiness and sedation as side effects.

66.

With her appeal, Ms. Nuss also submitted a letter from her former supervising partner, attorney John Bruffey.

67.

Mr. Bruffey was the partner in charge of Ms. Nuss's practice group and worked with her closely on a day-to-day basis.

68.

Mr. Bruffey explained the highly demanding nature of working as a workers' compensation defense attorney and stated categorically that following her illness, Ms. Nuss was no longer capable of performing the duties of her occupation.

69.

Mr. Bruffey stated that "When Ingrid came back to work after her illness, she was slow mentally and not up to speed in terms of her legal knowledge and lacked the ability to distinguish important facts of a case. She also lacked the ability to keep up with deadlines. She lacked the ability to concentrate for the period of time necessary to complete a task. In the middle of the day she would have to throw up numerous times. After throwing up she seemed drained of energy and listless physically and mentally. She would all of a sudden become very sleepy and need to take a nap. She would have to go home in the middle of the day and then would be out of work for several days. I cannot allow her to work for me because I believe she is not capable of doing the required work of a defense lawyer in a workers compensation setting which is fast paced and can be very stressful."

70.

Finally, Ms. Nuss's appeal included a report from a certified vocational expert, Earl Thompson, who concluded that Ms. Nuss's medical condition would render her unable to meet the demands of a full-time attorney.

71.

In evaluating Ms. Nuss's appeal, Guardian consulted with a physician, Thomas Liebermann, M.D, arranged through a third-party vendor, Exam Coordinators Network ("ECN").

72.

Upon information and belief, ECN's sole business model is to arrange/provide medical opinions and examinations to the insurance industry.

73.

Upon information and belief, ECN earns all, or nearly all, its revenue from the insurance industry.

74.

Upon information and belief, ECN produces medical reports that are heavily biased and designed to offer support for insurance claim denials.

75.

Upon information and belief, the process by which ECN obtains its reports is non-transparent, with the effect of sidestepping the disclosure requirements ERISA imposes on insurance companies like Defendant Guardian.

76.

Upon information and belief, Paragraphs 72-75 above also describe ECN's relationship with Guardian.

77.

Dr. Liebermann, through ECN, performed a review of Ms. Nuss's claim (or at least the parts provided by Guardian) and determined that she could return to work full-time as an attorney.

78.

Dr. Liebermann did not examine Ms. Nuss.  His conclusion was based on nothing more

than a cursory review of the paper file – a file which was notably incomplete.

79.

Guardian did not provide ECN or Dr. Liebermann with Ms. Nuss's appeal letter containing her description of the frequency and severity of her disabling symptoms, nor Dr. Waring's statements clarifying his December 2018 office visit note, nor John Bruffey's statement regarding Ms. Nuss's inability to perform her job duties.

80.

Guardian also did not provide ECN or Dr. Liebermann with the office notes of colorectal surgeon Monica Hum, M.D., who Ms. Nuss saw in June of 2019 at Dr. Waring's request. Guardian possessed that office note because Ms. Nuss provided it to them with her appeal.

81.

Because Dr. Liebermann offered an opinion based solely on a paper review of incomplete evidence, his conclusions are unreliable due to lack of solid or complete evidentiary foundation.

82.

Guardian thus failed to comply with ERISA's regulatory requirement that its review process "take[] into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iv).

83.

Dr. Liebermann's finding that Ms. Nuss could return to work full-time as an attorney was based in large part on his interpretation of Dr. Waring's December 2018 office visit note containing vague references to improvement in Ms. Nuss's symptoms, without the benefit of his letter placing

those notations in context, without the benefit of Dr. Hum's notes, without the benefit of pharmacy records, and without the benefit of the important historical information contained in statements from Ms. Nuss and her law firm supervisor.

84.

Dr. Liebermann's own report confirms his conclusions were also based on the patently false assumption that Ms. Nuss does not have substantial dietary restrictions. The record confirms that Ms. Nuss does, in fact, have a highly restricted diet.

85.

In a classic example of cherry-picking, Dr. Liebermann placed significant weight on a "normal" 2015 gastric emptying scan, which he characterized as "recent," despite being four years old. In another display of pro-insurer, anti-claimant bias, Dr. Liebermann failed to mention that widely published medical literature confirms that a "normal" test result is common with legitimate cases of gastroparesis. This test can rule in, but cannot rule out, a diagnosis of gastroparesis.

86.

Despite that certain of Ms. Nuss's medications (especially Thorazine) are known to cause drowsiness and mental fogginess as side effects, Dr. Liebermann further opined that these would not impact Ms. Nuss's functioning because most patients "become accustomed to" them. He did not offer any support for this assertion other than his own say-so.  His conclusion on this point, like many others, is conclusory and lacks any evidentiary foundation whatsoever.

87.

Guardian released Dr. Liebermann's initial peer review report to Ms. Nuss and to Dr. Waring for response.

88.

In discussions both with Dr. Liebermann and with Guardian claims personnel, Dr. Waring vehemently refuted the conclusions of Dr. Liebermann's peer review report and reiterated that he believes Ms. Nuss to be disabled from working as an attorney.

89.

Dr. Liebermann issued a final peer review report following his conversation with Dr. Waring, which reflects that Dr. Waring "felt the 'patient would never be able to go back to work as a lawyer.'"

90.

Guardian never corrected its failure to provide Dr. Liebermann with all of Ms. Nuss's evidence. Thus, when Dr. Liebermann issued his final report, he still had not reviewed Ms. Nuss's pharmacy records, Dr. Hum's records, nor Ms. Nuss's or her supervisor's statements providing important historical information.

91.

Dr. Liebermann's final report offered no new factual foundation for his conclusory opinion, which continued to contradict Ms. Nuss's first-person accounts and the opinions and explanations offered by her longstanding treating physician.

92.

Notations in the claim file reflect that Dr. Waring was deeply skeptical of Dr. Liebermann's claimed ability to assess Ms. Nuss's functionality without examining her. Upon reviewing Dr. Liebermann's final report, Dr. Waring stated to Guardian that Dr. Liebermann "should be ashamed of himself" due to the several false assertions and medically inaccurate conclusions contained in

his report.

93.

By letter dated March 13, 2020, Guardian upheld its decision to terminate Ms. Nuss's benefits relying almost entirely upon the flawed, unreliable and incomplete opinion of Dr. Thomas Liebermann.

94.

Given its numerous flaws, Dr. Liebermann's report does not constitute substantial evidence and Guardian's uncritical adoption of his conclusions was arbitrary and capricious, especially in the face of the much more reliable evidence supporting Ms. Nuss's continuing disability.

95.

In denying Ms. Nuss's appeal, Guardian violated ERISA's full and fair review requirements by, among other things:

- Failing to obtain and consider all of Ms. Nuss's relevant medical records (withholding Dr. Hum's records and failing to obtain Ms. Nuss's pharmacy records establishing constant use of heavy medications) which demonstrate that Ms. Nuss maintained an appropriate level of treatment and care during 2019;

- Failing to provide all of Ms. Nuss's evidence to its consultant physician;

- Failing to undertake an appeal review that "takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iv);

- Failing to ensure the "independence and impartiality" of the medical professional

reviewing Ms. Nuss's claim 29 C.F.R. § 2560.503-1(b)(7);

- Uncritically adopting the opinions of a paper-review physician consultant which were unreasonable and contrary to the great weight of the medical evidence;

- Intentionally "cherry-picking" the record to emphasize isolated and vague notations of "doing well" with medications, ignoring context and minimizing or ignoring a much larger, higher-quality body of evidence clearly establishing Ms. Nuss's continuing entitlement to benefits;

- Utilizing a non-transparent process of generating consulting physician reports that flouts the spirit and letter of ERISA's disclosure requirements and that generates reports biased in Guardian's favor; and

- Inappropriately insisting upon evaluating Ms. Nuss's claims in terms of "restrictions and limitations" – a metric which is at best vague for her type of disabling condition – without ever communicating to Ms. Nuss the type of evidence it would consider sufficient to demonstrate such "restrictions and limitations."

## Ms. Nuss's Requests to Reopen the Administrative Record Prior to Initiating This Lawsuit

96.

Upon receiving Guardian's March 13, 2020 decision to uphold its termination of benefits, Ms. Nuss retained counsel to represent her in her dispute with Guardian.

97.

Through counsel, Ms. Nuss twice requested that Guardian reconsider her disability claim based on its failure to consider all of her evidence in the context of its appeal review.

98.

Ms. Nuss notified Guardian that it had not obtained her pharmacy records despite that medication was her primary form of treatment. She further notified Guardian that it had failed to provide the notes of colorectal surgeon, Dr. Hum, to its medical consultant - despite that Ms. Nuss had provided Guardian one such note and made Guardian aware of Dr. Hum's involvement in her care. She also notified Guardian that it had failed to provide its consultant with Ms. Nuss's own firsthand statement describing the frequency and severity of her disabling symptoms, as well as statements from her treating physician and supervisor. Ms. Nuss expressed her concern that Guardian's decision to deny her appeal was the result of a misunderstanding on Guardian's part as to the nature and frequency of her treatment in 2019.

99.

Ms. Nuss included additional evidence with her request for reconsideration to Guardian. These additional pieces of evidence included a narrative statement from Ms. Nuss (attached hereto as Exhibit B), one month of detailed daily symptom journals (Exhibit C), narrative medical reports from Dr. Waring (Exhibit D) and Dr. Hum (Exhibit E), pharmacy records reflecting Ms. Nuss's ongoing treatment throughout 2019 (Exhibit F), and statements from numerous witnesses (combined as Exhibit G) attesting to their first-hand observations of the decline in Ms. Nuss's functioning since she became ill.

100.

Ms. Nuss also sought clarification from Guardian regarding the type of evidence it was seeking as to her "restrictions and limitations." In other words, Ms. Nuss asked Guardian what additional material was necessary to perfect her appeal – information that Guardian was legally

obligated to communicate to Ms. Nuss in its benefit determination letter, but which Guardian had failed to provide.

101.

By letter dated August 3, 2020, Guardian refused to reopen Ms. Nuss's claim and refused to consider her additional evidence or to include such evidence in the claim file. Guardian also refused to provide any clarification as to what restrictions and limitations means in the context of a chronic GI illness or what additional evidence was needed to perfect the claim.

102.

In its letter of August 3, 2020, Guardian did not state any basis for its refusal to reconsider Ms. Nuss's claim, other than Guardian did not feel it was required by law to do so. Guardian also did not dispute any of the shortcomings in its claim handling as laid out in Ms. Nuss's request to reopen and as described in Paragraph 100.

103.

Thus, Guardian has refused to engage in a reasonable dialogue with Ms. Nuss.

## COUNT I: BENEFITS DUE UNDER 29 U.S.C. § 1132(a)(1)(B)

104.

Plaintiff hereby repeats and realleges the allegations of Paragraphs 1 through 103 above, as if set forth verbatim herein.

105.

At all times since September 2014, Ms. Nuss has been disabled under the terms of the Plan by symptoms of severe and chronic nausea, abdominal pain and fatigue and by the interference in concentration, reliability and productivity that go with them.

106.

Defendant Guardian's refusal to pay LTD benefits beyond October 21, 2019 is wrong, unreasonable, violates the terms of the Plan, and is completely contrary to the weight of credible evidence in its file.

107.

Ms. Nuss is entitled to LTD benefits under the Plan retroactive to October 21, 2019 and continuing through the date of this Court's final judgment.

108.

Ms. Nuss is further entitled to interest on all past due amounts pursuant to ERISA 29 U.S.C. § 1132(a)(1)(B).

109.

Plaintiff has retained counsel to represent her in this matter, and is entitled to an award of costs, including a reasonable attorney's fee, pursuant to ERISA 29 U.S.C. § 1132(g)(1).

110.

Based on Guardian's current and past violations of full and fair review (*See* ¶ 91), this Court should review the merits of Ms. Nuss's disability claim *de novo*.

111.

WHEREFORE, Ms. Nuss prays for relief in the following forms:

a) An order finding Defendant's termination of Plaintiff's benefits was *de novo* wrong and/or an abuse of discretion;

b) An award of long-term disability benefits retroactive to October 21, 2019, and continuing through the date of this Court's judgment, plus prejudgment interest and

Plaintiff's reasonable expenses of litigation, including a reasonable attorney's fee;

c) A clarification of Plaintiff's rights ordering Guardian to continue paying disability benefits unless and until she actually returns to work full-time and is able to earn more than the plan's maximum allowable disability earnings or unless there is evidence of improvement of Plaintiff's medical condition(s) establishing that she can reliably and consistently resume full-time work as a workers' compensation defense attorney;

d) In the alternative to an award of benefits, based on Guardian' procedural violations, an order remanding the matter to Guardian ordering it to re-open the claim and to consider Ms. Nuss's additional evidence; and

e) Such other and further relief as the Court may deem just and proper.

Respectfully submitted, this the 3rd day of November, 2020.


By: */s/ Jennifer L. Hess*

Jennifer L. Hess (No. JS3684)
RIEMER HESS LLC
Attorneys for Plaintiff
Serving as Co-counsel
275 Madison Avenue, 26th Fl.
New York, NY 10016
T: (212) 297-0700
F: (212) 297-0730
E: jhess@riemerhess.com